IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

KIMMIE JACKSON,                                    Case No. 6:23-cv-00690-AP

            Plaintiff,                          **OPINION & ORDER**

   v.

CITY OF YACHATS,

           Defendant.

_____

POTTER, United States Magistrate Judge:

    Plaintiff Kimmie Jackson[1] alleges that her employer, Defendant City of Yachats engaged in a pattern of discriminatory conduct against her. First Amended Complaint (FAC), ECF No. 27. She brings claims under Title VII of the Civil Rights Act for discrimination due to race and ethnicity (42 U.S.C. § 2000e-2(a)) and for retaliation (42 U.S.C. 2000e-3(a)). She also brings corresponding state law claims for race discrimination (ORS 659A.030) and retaliation (ORS 659A.030(1)(f)) as well as a claim for disability discrimination (ORS 659A.112 and 659A.230).[2]

    Defendant now moves for summary judgment on all of Plaintiff's claims. Defendant argues first and foremost that Plaintiff's claims are barred under Oregon's Workers' Compensation Act (OWCA) statutes. Def.'s Mot. 7-8, ECF No. 40. In the alternative, Defendant

_____

[1] Originally there was a second plaintiff, Anita Sites, but she reached an agreement with Defendant and has withdrawn from the case.

[2] Plaintiff withdrew additional claims for interfering with medical leave and retaliation under ORS 659A.183 and ORS 659A.030(g). Pl.'s Resp. 30, ECF No. 49.

argues that summary judgment is appropriate because Plaintiff failed to comply with the tort claim notice requirement under the Oregon Tort Claims Act (OTCA), and that some of Plaintiff's claims fall outside the statute of limitations. Def.'s Mot. 8-11. Finally, Defendant argues that Plaintiff's claims fail as a matter of law because Plaintiff has failed to provide evidence to support a prima facie case for discrimination and retaliation. Def.'s Mot. 11-22.

For the reasons stated below, Defendant's motion is GRANTED in part and DENIED in part.

## BACKGROUND

Plaintiff began working for the City of Yachats in July 2011. FAC ¶ 52. Plaintiff is the only Black employee and the only employee of color within the city. FAC ¶ 53. Defendant City is a small public employer, located in Lincoln County, Oregon. FAC ¶ 8. At all times relevant to this case, Defendant employed fewer than 25 people. First Lambert Decl. ¶ 3, ECF No. 44. Over the years, Defendant has had difficulty finding a permanent city manager. Consequently, throughout her employment with the city, Plaintiff has worked under a series of city managers and interim city managers. And although Plaintiff's complaint purports to focus only on those actions taken by City Manager Lambert, her allegations of wrongdoing extend to a much larger group of former city managers and interim city managers. Pl.'s Resp. 12, ECF No. 49.

### A.  City Manager Davies

Joan Davies was city manager from 2016 to 2017. FAC ¶ 57. During Ms. Davies term as city manager, Plaintiff alleges she was subjected to "racial and ethnic slurs," as well as "false accusations of laziness, incompetence, and other racist tropes." *Id*. Under Davies' watch, another city employee, Judy Richter, accused Plaintiff of running a notary business from city offices, and began reporting concerns with Plaintiff's work habits. Plaintiff alleges Davies and Richter made

false claims about her, resulting in "increased scrutiny by public enforcement." FAC ¶ 57.

Davies resigned her role with the city in 2017. FAC ¶ 57-58. According to Plaintiff, after Ms.

Davies resigned, she continued monitoring Plaintiff's work activities and even followed Plaintiff

when she took time off to attend a medical appointment. *Id.* ¶ 58.

### B.  City Manager Beaucaire

In October 2017, Shannon Beaucaire was hired to replace Davies as city manager.

Beaucaire Decl. ¶ 1, ECF No. 43. During Ms. Beaucaire's term as city manager, Plaintiff alleges

that Ms. Richter continued to monitor and report her movements, even going as far as recording

each time she got up to use the restroom. FAC ¶ 59. Plaintiff reported her concerns with Ms.

Richter's behavior to Ms. Beaucaire who then placed Ms. Richter on a work plan in order to

"focus[] on her own work performance issues."  FAC ¶ 59; Beaucaire Decl. ¶ 5. Ms. Richter

resigned shortly thereafter. Beaucaire Decl. ¶ 5.

In 2019, Plaintiff alleges a Council of Governments (COG) employee went through her

desk and made the comment, "I see that voodoo doll. Don't do voodoo on me." FAC ¶ 63.

According to Ms. Beaucaire, Plaintiff reported the encounter "[w]eeks after the alleged incident

occurred" and Ms. Beaucaire promptly reported the incident to the COG supervisor. Beaucaire

Decl. ¶ 3. It's unclear if any further action was taken by COG personnel. Beaucaire left the City

in March 2021. Beaucaire Decl. ¶ 1.

### C.  City Manager Guenther

In June 2021, Katherine Guenther was appointed to the role of interim city manager.

Guenther Decl. ¶ 1, ECF No. 42. On December 22, 2021, Plaintiff submitted Family and Medical

Leave Act (FMLA) paperwork to Ms. Guenther, citing the need for six months medical leave

due to PTSD starting the 22nd. Guenther Decl. ¶ 3 Ex. 6. On January 21, 2022, while still out on

leave, Plaintiff filed a tort claims notice (TCN) with the City. FAC ¶ 73.

Guenther's term as interim city manager ended in February 2022. Guenther Decl. ¶ 1.

*D.  City Manager Lambert*

In February 2022, Heide Lambert was hired as city manager. First Lambert Decl. ¶ 1. On

March 17, 2022, while still on leave, Plaintiff filed a complaint with the Oregon Bureau of Labor

and Industries (BOLI). FAC ¶ 73. Shortly after, on March 30, 2022, Plaintiff filed a claim under

Oregon's workers' compensation act (OWCA), citing her ongoing "stress, anxiety, PTSD, [and]

adjustment disorder." First Lambert Decl. ¶ 4 Ex. 4 (OWCA Claim).

On March 31, 2022, Ms. Lambert notified Plaintiff that FMLA leave was not available to

City employees due to the small size of the city staff. First Lambert Decl. ¶ 6 Ex. 5. Ms. Lambert

also explained that Plaintiff appeared mistaken that she was entitled to six months of leave under

the city's policy. *Id.*

Following Ms. Lambert's letter, Plaintiff and her medical providers submitted

inconsistent information regarding Plaintiff's ability to return to work. For example, on May 2,

2022, one of Plaintiff's doctors submitted a letter stating Plaintiff would need to delay returning

to work for at least a month, as she was experiencing "active symptoms of PTSD" which

"contribute[d] to her not being able to enter the business [sic] or buildings within the city of

Yachats, where her employer is located, without significant stress or panic." Second Lambert

Decl. ¶ 2 Ex. 9, ECF No. 54.

Then, on May 16, 2022, one of Plaintiff's medical providers submitted a second letter

stating that Plaintiff "is not able to work at this time" and would require a "a longer period of

time to desensitize prior to returning to work." Second Lambert Decl. ¶ 3 Ex. 10. The letter also

stated that "from the patient's perspective, one of the most important parts of her return to work plan is not being in contact with the City Mayor or City Council." *Id*. Plaintiff's provider opined that "[Plaintiff] mentioned one way to accomplish this would be the city manager using a different building if they need to have contact with the mayor and city council." *Id*.

Then, on June 2, 2022, Plaintiff sent a letter to Ms. Lambert indicating she would be prepared to return to work, without restrictions, on June 13, 2022. Second Lambert Decl. ¶ 5 Ex. 11. In her letter, Plaintiff asked for "adjustments for [] working conditions as identified in the letters from my doctor" including an alternative four-day work schedule, permission to work from home occasionally, and having "elected officials make an appointment and have those meetings in council chambers whenever possible." *Id*.

In response, Ms. Lambert asked that Plaintiff provide documentation she was fit to resume all duties "consistent with her job description and without restriction." Second Lambert Decl. ¶ 6. Ms. Lambert supplied a questionnaire regarding Plaintiff's fitness to return to work, including what accommodations she might need, for Plaintiff's medical provider to fill out. Second Lambert Decl. ¶ 7 Ex. 12.

Following Ms. Lambert's request, Plaintiff and her medical providers submitted conflicting information as to when Plaintiff could return to work and what accommodations she would need. For example, on June 16, 2022, one of Plaintiff's providers sent a letter dated June 15, 2022, stating Plaintiff "may return to full duty immediately with no restrictions." Second Lambert Decl. ¶ 9 Ex. 13. Shortly after, Plaintiff told Ms. Lambert she could not return to work until June 20, 2022. Second Lambert Decl. ¶ 10. Ms. Lambert again requested that Plaintiff's medical provider confirm in writing that Plaintiff could resume all her work responsibilities. Second Lambert Decl. ¶ 11.

PAGE 5 – OPINION & ORDER

On June 22, 2022, Ms. Lambert notified Plaintiff that her provider's return to work letter dated June 15, 2022, was acceptable and confirmed Plaintiff's return to work date of July 1, 2022. Second Lambert Decl. ¶ 12 Ex. 14. Ms. Lambert retroactively placed Plaintiff on administrative leave from June 15 through July 1, ostensibly because at that point, Plaintiff had run out of paid leave. Second Lambert Decl. ¶¶ 12-13 Ex. 14. Then, on June 23, 2022, Plaintiff informed Lambert she could not return to work until July 5. Second Lambert Decl. ¶ 14.

Plaintiff returned to work as scheduled on July 5, 2022. FAC ¶ 74. Upon her return, Plaintiff requested time off for upcoming medical appointments, and Ms. Lambert asked for written documentation of upcoming appointments from Plaintiff's medical providers. Second Lambert Decl. ¶ 15. On July 13, 2022, Plaintiff submitted a medical form from her provider stating she was permanently unable to perform the essential functions of her job. Second Lambert Decl. ¶ 16 Ex. 15. Based on this letter, Plaintiff was placed on unpaid administrative leave and given 10 days to provide additional medical documentation as to whether she was fit to return to work. Second Lambert Decl. ¶ 17.

On July 15, 2022, Plaintiff submitted a new medical form from the same provider indicating she could return to work without restrictions but had "upcoming medical appointments that do not limit function or ability while on the job." Second Lambert Decl. ¶ 18 Ex. 16. Although no specific date was provided, at some point after July 15, Plaintiff provided the necessary medical documentation, as she returned to work and her unpaid leave was converted to paid leave. Second Lambert Decl. ¶ 19.

Upon returning to work, Plaintiff alleges her workspace had been moved to a different location in the office and her desk setup was changed. FAC ¶ 80. Prior to taking leave, Plaintiff alleges that her workspace had been "set up specifically as an accommodation for her back."

FAC ¶ 80. Plaintiff alleges that she informed Ms. Lambert that she needed her old desk back as an accommodation for her disability, and Ms. Lambert refused because "two other temporary white co-workers were going to be assigned that space." FAC ¶¶ 80-82. Plaintiff alleges she worked for the remainder of 2022 "in pain with the new setup that forced her to lean to the left to do her work." FAC ¶ 83.

During Ms. Lambert's term as city manager, Plaintiff alleges she was required to "account for every minute of her workday, including any doctor's appointments, of which there were many for ongoing medical issues." FAC ¶ 93. Additionally, Plaintiff alleges she had new restrictions placed on her access to emails, files, and other documents. FAC ¶ 86, 90. While she was on leave, Plaintiff states that "all but two of her job responsibilities" were taken away, and she was required to submit her work to a white co-worker to be reviewed. FAC ¶ 86, 91. Ms. Lambert resigned from her role with the city on May 31, 2023. FAC ¶ 102.

E. *City Manager Sant*

Rick Sant was then appointed to act as interim city manager. FAC ¶ 107. Plaintiff states that at some point in June 2023, she began "essentially" performing the duties of the city manager including "re-writing job descriptions, training all the new staff or providing them with resources on how to obtain proper training," and helping to "hire proper staff." FAC ¶ 111. On July 1, 2023, Plaintiff asked Mr. Sant for out-of-class play; Mr. Sant granted the request effective on July 15. FAC ¶ 112. Mr. Sant left the city in November 2023, and the city hired Bobbi Price to the role of city manager. FAC ¶ 115.

## STANDARDS

### I.    Summary Judgment

Summary judgment is warranted when, based on the pleadings, depositions, and other interrogatories and admissions on file, together with the affidavits, if any, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A dispute is considered "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it could affect the outcome of the case; disputes about irrelevant or unnecessary facts do not preclude summary judgment. *Id.* And the materiality of the fact is "determined by the substantive law governing the claim." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Whether there is a genuine issue of material fact is often a close question. *Id.* Thus, the moving party bears an initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party cannot merely rely on allegations in the pleadings or claims that it will discredit the moving party's evidence at trial. *Id.* But neither party need prove any fact conclusively at this stage. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party and when evidence conflicts, the court "must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *Id.* at 631. At bottom, "if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *Id.*

## II.    Evidence Admissibility at Summary Judgment

Defendant moves to strike evidence filed in support of Plaintiff's Response in Opposition to Summary Judgment. Plaintiff filed 40 exhibits in support of her Response to summary judgment. Cambreleng Decl., Exs. 1-40, ECF No. 50. Defendant argues that exhibits 1-4, 6, 8-13, 15-23, 27-31, 33-38, and 40, are unauthenticated and thus inadmissible at this stage of the proceedings.[3] Def.'s Repl. 2-3, ECF No. 52. Defendant notes that exhibits 5,[4] 7, 14, 24, 25, 26, 32, and 39 are self-authenticating transcripts of sworn deposition testimony and are therefore admissible.

In considering a motion for summary judgment, the Court cannot consider evidence that could not "'be presented in a form that would be admissible at trial.'" *Harlow v. Chaffey Cmty. Coll. Dist.*, No. 21-55349, 2022 WL 4077103, at *1 (9th Cir. Sept. 6, 2022) (quoting Fed. R. Civ. P. 56(c)(2)). The party seeking admission of evidence bears the burden of proving that the evidence could be presented in an admissible form at trial. *See Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002). Upon objection to the admission of the evidence, the proponent must then "direct the court to 'authenticating documents, deposition testimony bearing on attribution, hearsay exceptions and exemptions, or other evidentiary principles under which the evidence in question could be deemed admissible . . . .'" *City of Lincoln v. Cnty. of Placer*, 668 F. Supp. 3d 1079, 1086 (E.D. Cal. 2023) (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385–86 (9th Cir. 2010)).

---

[3] Defendant also points out that one of the documents provided appears to be privileged attorney work-product. *Id*. at 3.

[4] Defendant included exhibit 5 as among Plaintiff's unauthenticated exhibits. However, exhibit 5 is a transcript of Ms. Guenther's sworn deposition testimony, and thus is self-authenticating. The court assumes including exhibit 5 in the motion to strike to be a harmless scrivener's error on Defendant's part.

However, even if the proffered evidence "falls short of the 'formalities of Rule 56,' a district court may nonetheless exercise its discretion 'to be somewhat lenient.'" *Id.* (quoting *Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1261 (9th Cir. 1993)). For example, courts have found "foundation and authenticity problems are nonfatal if the substance could conceivably be made admissible at trial." *Id.* at 1087 (quoting *Portnoy v. City of Davis*, 663 F. Supp. 2d 949, 953 (E.D. Cal. 2009)).

Thus, if the Court concludes that the "contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that the document itself might be excludable [] provides no basis for refusing to consider it on summary judgment." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021). The burden of proof, however, remains with the proponent to show on what basis the challenged evidence could be admitted. *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 385–86; *see also Heko Servs., Inc. v. ChemTrack Alaska Inc.*, 418 F. Supp. 3d 656, 659-60 (W.D. Wash. 2019) (holding that "[o]n an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case") (citing *Celotex*, 477 U.S. at 323 (1986)).

Here, Plaintiff failed to respond to Defendant's objections to the evidence and thus provided no reasons prior to the hearing, as required by the Local Rules, under which the Court could consider admitting the challenged evidence.[5] *See Sweet People Apparel, Inc. v. Phoenix*

---

[5] Under the local rules, Plaintiff had seven days in which to file a surreply to Defendant's evidentiary objections. *See* LR 56-1(b) ("[i]f an evidentiary objection is raised by the moving party in its reply [], the non-moving party may file a surreply memorandum... within seven days addressing only the evidentiary objection").

*Fibers, Inc.*, 748 F. App'x 123, 124 (noting that plaintiffs bear the burden to show that contested evidence is "admissible as presented or to explain the admissible form that is anticipated") (quoting Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment). Nor is it the responsibility of the Court to "comb through [] voluminous record[s] searching for evidentiary bases to introduce the evidence at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 386. That responsibility lies with the Plaintiff to identify the "evidentiary principles under which the evidence in question could be deemed admissible." *Id*. at 385-86.

During a hearing on the instant motion, Plaintiff's attorney stated that she believed most of the challenged evidence had already been authenticated through deposition testimony or affidavit. And Plaintiff asked for leave to amend her declaration and provide the authentication details for all exhibits. Although the Court considered granting Plaintiff's request for leave to amend, that request is ultimately unnecessary as the evidence in question would not change the disposition of this case. Thus, the motion to strike is denied as moot. *See Menchu v. Multnomah Cnty. Health Dep't,* No. 3:20-cv-00559-AR, 2024 WL 4242514, at *4 (D. Or. Aug. 16, 2024), *report and recommendation adopted*, 2024 WL 4242016 (D. Or. Sept. 18, 2024), *appeal filed*, No. 24-5902 (9th Cir.).

## DISCUSSION

### I.    Oregon Workers' Compensation Act Exclusive Remedy Provision

Defendant argues Plaintiff's claims are barred based on the OWCA's "sole and exclusive remedy" provision. Def.'s Mot. 7-8. The OWCA's exclusive remedy provision "generally makes an employer that satisfies its insurance obligations for subject workers immune from civil liability for injuries to a worker arising out of the worker's employment." *Nancy Doty, Inc. v. WildCat Haven, Inc.*, 297 Or. App. 95, 439 P.3d 1018, 1019 (2019); *see also* ORS 656.012(2)(e)

(policy objectives include the intent to "provide the sole and exclusive source and means by which subject workers . . . receive benefits on account of injuries or diseases arising out of and in the course of employment.").

It is Defendant's contention that Plaintiff 's claims in her FAC are identical to those in her workers' compensation claim. Def.'s Mot. 8. And Defendant notes that Plaintiff settled her workers' compensation claims for $70,000 on October 30, 2023. Def.'s Mot. 8; First Gaddis Decl. ¶ 4 Ex. 3 ECF No. 41. Therefore, Defendant argues that Plaintiff has exhausted her sole exclusive remedy and is not entitled to "additional remedies for claims she has already resolved." Def.'s Mot. 8.

Plaintiff in response argues that her claims are not barred, because according to the workers' compensation settlement agreement, her injuries were considered not compensable 0within the meaning of the OWCA. Pl.'s Resp. 10, ECF No. 49. The Court need not reach the question of compensability, however, as Plaintiff's discrimination and disability claims are not barred under the OWCA.

### A. Federal Claims Not Barred Under OWCA

Plaintiff's federal claims cannot be barred under the OWCA's exclusive remedy provision. While courts have generally recognized that exclusive remedy provisions found in state workers' compensation statutes protect employers from most common law claims, they cannot preclude claims that an employer violated an employee's federal constitutional rights. *See Von Heeder v. Safeway, Inc.*, No. 00-cv-0025-HA, 2001 WL 1703092, at *5 (D. Or. Nov. 11, 2001) (rejecting argument that OWCA settlement barred Title VII claims and citing cases). Any state workers' compensation law purporting to bar plaintiffs from asserting federal civil rights claims would certainly "'run afoul of the Supremacy Clause.'" *Id*. (quoting *Lopez v. S.B.*

*Thomas, Inc.*, 831 F.2d 1184, 1190 (2d Cir. 1987)); *see also E.E.O.C. v. Fred Meyer Stores, Inc.*,

954 F. Supp. 2d 1104, 1115 (D. Or. 2013), *on reconsideration in part* (Sept. 19, 2013) (holding

that Title VII claim is not barred by state's worker's compensation law even when defendant's

liability is predicated on a negligence standard); *Worthington v. City of New Haven*, No. 3:94-cv-

00609(EBB), 1999 WL 958627, at *8 (D. Conn. Oct. 5, 1999) ("A state law making recovery

under a worker's compensation statute the exclusive remedy for work-related injuries cannot bar

an employee from seeking relief for employment discrimination under the ADA . . . in light of

the Supremacy Clause of Article VI of the Constitution" (collecting cases)).

Plaintiff's federal constitutional claims for race discrimination and retaliation are

precisely the types of claims that cannot be extinguished by Oregon's worker's compensation

scheme. Under the Supremacy Clause, federal law preempts the state law to the extent the state

law "'stands as an obstacle' to Congress's full objectives." *Donnelly v. St. John's Mercy Med.

Ctr.*, 635 F. Supp. 2d 970, 988 (E.D. Mo. 2009) (quoting *Silkwood v. Kerr-Mcgee Corp.*, 464

U.S. 238, 248 (1984)).

Nor did Plaintiff expressly waive her right to pursue federal claims when she settled her

workers' compensation claim. For Plaintiff to have waived these rights, the settlement language

would need to explicitly identify Plaintiff's intent to waive her right to further constitutional

remedies. *See Fuentes v. Shevin*, 407 U.S. 67, 95-96 (1972) (holding that a contractual waiver of

constitutional rights, in any context, must be very clear). The workers' compensation settlement

states that, upon settlement approval, Plaintiff "will have no further entitlement to compensation

for the denied condition(s), disability, or for the denied injury or occupational disease." First

Gaddis Decl. ¶ 4 Ex. 3. The agreement also states that "[i]n consideration of the promise to pay

the agreed sum, [Plaintiff] hereby accepts the payment of this sum in full settlement of all issues

arising out of the denied treatment, condition(s), disability, injury, or occupational disease including interest accrued on benefits pending appeal." *Id*. The agreement is silent as to Plaintiff waiving her right to pursue further constitutional remedies. Because such an intention was not explicitly made, Plaintiff's federal constitutional claims are not barred by the settlement agreement.

### B. State Claims Not Barred

Similarly, the OWCA's exclusivity provision does not foreclose Plaintiff's ability to assert state claims for discrimination and retaliation. Oregon's workers' compensation laws and anti-discrimination laws each provide separate remedies for separate injuries. The purpose of Oregon's workers' compensation laws is to "provide a mechanism for compensation of workplace injuries." *Beaver v. NPC Int'l Inc.*, 451 F. Supp. 2d 1196, 1201 (D. Or. 2006); ORS 656.012(2)(e). In comparison, the state's anti-discrimination laws are meant to "prevent 'discrimination of any kind' in employment." *Beaver*, 451 F. Supp. 2d at 1201 (quoting ORS 659A.003)*; see also Palmer v. Bi-Mart Co.*, 92 Or. App. 470, 474, 758 P.2d 888, 891 (1988) (finding that the "legislature [] created two separate statutory schemes to protect employees from those separate injuries"). Claims brought under Oregon's anti-discrimination laws are therefore not subject to the exclusive remedy provision under Oregon's workers' compensation laws. *See Palmer,* 92 Or. App. at 474, 758 P.2d at 891 (finding that the exclusivity provision did not apply where the plaintiff sought remedy under both anti-discrimination and workers' compensation statutes).

Plaintiff asserts state claims based on anti-discrimination laws that are intended to provide an "'adequate remedy for persons aggrieved by certain acts of discrimination because of race, religion, color, sex, marital status, or national origin or unreasonable acts of discrimination

in employment based on age.'" *Id.* at 475 (citing ORS 659.022); *see also* ORS 659A.003(2)

(same). As such, it would be improper to find these claims are precluded by the OWCA. *See*

*Gibbs v. Orkin Exterminating Co.*, 74 F. App'x 747, 748 (9th Cir. 2003) (finding statutory

preemption improper when two independent statutory schemes target distinct aspects of a

defendant's conduct). And there is no clear waiver of these claims in her settlement.

Accordingly, her state law claims are also not barred under the OWCA's exclusive remedy

provision.

      Defendant's motion for summary judgment based on the OWCA's exclusive remedy

provision is DENIED.

## II.    Oregon's Tort Claims Act

      Defendant argues that Plaintiff failed to comply with notice requirements under the

Oregon Tort Claims Act (OTCA) and, as a result, some of her state law claims are time-barred.

      The OTCA governs tort actions brought against public bodies. *See* ORS 30.260 to

30.300. Under the OTCA, notice of all tort claims against a public body must be given within

180 days after the alleged loss or injury. ORS 30.275(2)(b). Plaintiffs can satisfy the notice

requirements through formal notice, actual notice of a claim, commencement of an action on the

claim by or on behalf of the claimant within the applicable period of time, or payment of all or

any part of the claim by or on behalf of the public body at any time. ORS 30.275(a)-(d).

      Defendant received Plaintiff's tort claim notice (TCN) on January 21, 2022. Def.'s Mot.

8; Pl.'s Resp. 11. Defendant argues that Plaintiff's notice only covers conduct 180 days prior to

the notice, putting the cutoff date on July 25, 2021. Def.'s Mot. 9. Furthermore, Defendant

argues that because Plaintiff failed to file any subsequent TCN, and filed her Complaint on May

10, 2023, allegations that took place on or between January 22, 2022, and November 1, 2022, were not properly preserved. *Id*.

Plaintiff's federal claims are not subject to OTCA notice requirements. *See Menchu*, 2024 WL 4242514, at *5; *see also Baumgarner v. Cmty. Servs., Inc.*, 992 F. Supp. 2d 1081, 1095 (D. Or. 2014) ("conclud[ing that] application of the OTCA notice requirement in Title VII and FMLA claims could 'burden the exercise of th[ose] federal right[s] [in a way that] is inconsistent in both design and effect with the compensatory aims of' Title VII and FMLA"). Thus, the only claims at issue here are Plaintiff's state law claims.

Plaintiff argues that her state law claims were properly preserved because she provided Defendant with actual notice of her intent to assert a claim. Under Oregon law, actual notice of a claim is

> any communication by which any individual to whom notice may be given as provided in subsection (5) [formal notice under ORS 30.275(5)] . . . or any person responsible for administering tort claims on behalf of the public body acquires actual knowledge of the time, place and circumstance giving rise to the claim, where the communication is such that a reasonable person would conclude that a particular person intends to assert a claim against the public body or an officer, employee or agent of the public body."

ORS 30.275(6). Plaintiff claims she provided "written notice to the City of continuing acts of discrimination and retaliation by Heide Lambert on October 6, 2022 and April 10, 2023" by sending letters to Ms. Lambert and the City. Pl.'s Resp. 11-12. She contends that her letters which describe the alleged discrimination, as well as the fact that there was an ongoing BOLI investigation, and that the "attorneys for the City and [Plaintiff] were involved" was sufficient to put the city on notice that Plaintiff's complaints were part of her "ongoing claim." Pl.'s Resp. 11-16. This is not the case.

PAGE 16 – OPINION & ORDER

A. *Plaintiff's Letters Describing the Discrimination*

Plaintiff, through her attorney, filed a TCN in January 2022. First Gaddis Decl. ¶ 3 Ex. 2. Shortly thereafter, on March 17, 2022, Plaintiff filed her BOLI complaint. FAC ¶ 73; Cambreleng Decl. ¶ 2 Ex. 1. Then on March 30, 2022, Plaintiff filed her workers' compensation claim. FAC ¶ 73; First Lambert Decl. ¶ 4 Ex. 4. Given Plaintiff's demonstrated capability to provide formal notice to the city, sending two informal letters describing alleged discriminatory actions would not sufficiently put the City on notice of Plaintiff's intent to file another complaint.

Moreover, although the record supports that Plaintiff sent the October 2022 and April 2023 letters in question, nothing in the record indicates either letter contained the requisite information to meet the statutory requirements for actual notice under the OTCA. Cambreleng Decl. ¶¶ 28, 32 Exs. 27, 30. For example, Plaintiff's October 2022 letter to Ms. Lambert contains several complaints about feeling excluded and general accusations related to Ms. Lambert creating a toxic work environment. Cambreleng Decl. ¶ 28 Ex. 27. Plaintiff then closes her letter with the statement "I believe at this point we need to include my union representative." Cambreleng Decl. ¶ 28 Ex. 27 at 3. This language could alert Defendants to possible future union involvement but does not infer the possibility of an impending lawsuit. Cambreleng Decl. ¶ 28 Ex. 27 at 3.

Similarly, Plaintiff's April 2023 email to the mayor, city council and a union representative does not provide Defendants with actual notice. Plaintiff's email alleges general complaints about her treatment at the hands of the City Manager Lambert. Cambreleng Decl. ¶ 31 Ex. 30. It also mentions past union grievances as well as having had her attorney write letters. *Id*. at 3. She closes her letter with the statement "I sincerely hope you will address this situation

we find ourselves in today and make working at the city the place it should be and not the place it has become." *Id*. Plaintiff again makes no mention of a possible lawsuit.

Neither letter, alone or in combination, is sufficient to meet the standard for actual notice under the OTCA. There is no assertion of the time, place, and circumstances giving rise to Plaintiff's claims. Nor is there an indication that Plaintiff intended to file another complaint against the City. *See, e.g., Daniel v. Oregon Health & Scis. Univ.*, 262 F. Supp. 3d 1079, 1088 (D. Or. 2017) (rejecting the proposition that actual notice had been provided where the plaintiff failed to provide the time, place, and circumstances giving rise to the claim, and where plaintiff failed to state an intent to assert a claim against the defendant). Thus, the October and April letters failed to provide actual notice under the OTCA. ORS 30.275(6).

   *B.  BOLI Complaint*

Plaintiff's BOLI complaint also is not sufficient to provide actual notice to Defendant. *See Daniel*, 262 F. Supp. 3d at 1088 (rejecting the position that an employer was on notice based on Plaintiff's filing a BOLI complaint); *Shepard v. City of Portland*, 829 F. Supp. 2d 940, 958 (D. Or. 2011) (holding that a BOLI complaint "does not provide actual notice of a plaintiff's intent to file a lawsuit because a plaintiff is not required to file a BOLI complaint prior to filing an employment discrimination suit under state of law") (quoting *Lucke v. Multnomah Cnty.*, No. 06-cv-1149-ST, 2008 WL 4372882, at *22 (D. Or. Sept. 22, 2008), *aff'd in part,* 365 F. App'x 793 (9th Cir. 2010)).[6] Thus Plaintiff cannot rely on her BOLI complaint to provide Defendant with actual notice.

---

[6] Even if Plaintiff's BOLI complaint could meet the statutory requirements for actual notice, the timing of the BOLI complaint would add little to her claims. Plaintiff's BOLI claim was filed on March 17, 2022, after she had been on leave for nearly three months. No new claims are alleged as taking place during these three months. Also, Plaintiff would only be able to consider claims from 180 days prior to the date of that notice, meaning the cutoff date the claims would be

C. *Attorney Involvement*

Attorney involvement in BOLI and workers' compensation claims is also not sufficient to provide actual notice. *See Daniel*, 262 F. Supp. 3d at 1088 (rejecting the position that an employer was on notice based on Plaintiff's lawyer notifying employer of a "potential claim" against them). Had Plaintiff's attorney provided a letter indicating the "time, place and circumstances giving rise to the claim" or a statement that "a claim for damages is or will be asserted" against Defendant, such letter could sufficiently demonstrate actual notice. *Id*. The record contains no evidence of Plaintiff's attorney communicating the events giving rise to Plaintiff's claims, or her intent to file a claim at any time between her January 2022 TCN and her May 2023 Complaint. Even construing Plaintiff's FAC liberally in her favor, there simply is not enough evidence to support the contention that she preserved her state claims through actual notice.

Plaintiff's TCN, filed on January 21, 2022, and Plaintiff's Complaint, filed on May 10, 2023, are the only documents that satisfy the requirements of notice under the OTCA. *See* ORS 30.275(3)(a)-(c). Consequently, Plaintiff can base her state law claims only on conduct that occurred within the 180 days prior to each date. Plaintiff's state law claims are, therefore, limited to alleged conduct occurring during the following periods: July 25, 2021 through January 21, 2022 (the first TCN period) and November 11, 2022 through May 10, 2023 (the second TCN period).

---

September 18, 2021. This date is already within the 180 days prior to the January 2022 TCN, meaning any claims alleged during this time would be subsumed under the original TCN.

### III.    Statutes of Limitation

Defendant also argues that some of Plaintiff's claims fall outside the applicable statutes of limitation. Def.'s Mot. 9. The relevant Oregon state law statutes of limitation for civil actions alleging discrimination and retaliation is five years. *See* ORS 659A.820(3). But for alleged violations occurring before September 2019, the relevant statute of limitation was only one year.[7] Consequently, to survive Defendant's motion, Plaintiff's claims must fall within the statutory timeframe.

Any of Plaintiff's claims that occurred prior to September 2019 are subject to the one-year statute of limitation and cannot be used to bolster her current claims. In her FAC, Plaintiff alleges wrongdoing prior to the tort claim period and extending as far back as 2017. FAC ¶¶ 54-57. Plaintiff contends that her claims are not based on those earlier allegations. Pl.'s Resp. 12 Rather, Plaintiff argues that she "is focusing instead on the more recent events under City Manager [] Lambert" and only refers to those earlier alleged acts in order to "inform the reasonableness" of her claims. Pl.'s Resp. 12. But Plaintiff fails to explain how actions by completely different city managers that occurred years before Ms. Lambert was even hired inform her claims against Ms. Lambert, much less how those actions are admissible. *See* Fed. R. Evid. 404(a)(1). Only Plaintiff's claims for actions occurring after September 2019 may proceed.

### IV.    Race Discrimination Claims

Plaintiff alleges Defendant discriminated against her "in the terms and conditions of [her] employment" based on race in violation of 42 U.S.C. § 2000e-2(a) and ORS 659A.030. The state law discrimination claims are analyzed the same way as the federal claims. *Davis v. Tri-Cnty. Metro. Transp. Dist. Of Oregon*, 45 F. Supp. 3d 1222, 1251 (D. Or. 2014). Under the applicable

---

[7] See Oregon Senate Bill 479 2019 at 3.

test, Plaintiff must first establish a prima facie case of discrimination. *Dawson v. Entek Int'l*, 630 F.3d 928, 934-35 (9th Cir. 2011). If Plaintiff does so, it falls to Defendant to offer a legitimate, nondiscriminatory reason for the action. *Id.* If Defendant does so, Plaintiff must show that the legitimate action is merely a pretext for discrimination. *Id.*

Defendant contends that Plaintiff has failed to establish a prima facie case of racial discrimination. To establish a prima facie case for racial discrimination, Plaintiff must show that (1) she is a member of a protected class; (2) she performing as expected or that she was qualified for her position or the positions to which she applied; (3) she experienced an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *Brown v. King Cnty.*, 823 F. App'x 478, 480 (9th Cir. 2020); *Davis*, 45 F. Supp. 3d at 1251 (citing *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004)). Plaintiff needs very little evidence to survive summary judgment in a discrimination case. *Brown*, 823 F. App'x at 480.

Plaintiff is a member of a protected class. The record also shows that Plaintiff was qualified for and performing her job adequately. Indeed, she continues in her role with the City to this day. Jackson Decl. ¶ 3. The question is whether Plaintiff has established that she was subject to an adverse employment action and that others were treated differently or there is an inference of discrimination.

Plaintiff alleges three specific adverse employment actions: (1) that Defendant failed to appoint Plaintiff to "fill in as interim City Manager;" (2) that Plaintiff's salary was reduced and

she was denied out-of-class compensation; and (3) that Plaintiff was twice placed on unpaid administrative leave and placed on a work plan by Ms. Lambert.[8] Pl.'s Resp. 14-16.

     *A.   Interim or Pro Tem City Manager Position*

     Plaintiff has plausibly alleged that she experienced an adverse employment action in being overlooked for appointment to serve as interim city manager. "An adverse employment action is one that 'materially affect[s] the compensation, terms, conditions, or privileges of . . . employment.'" *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (quoting *Chuang v. Univ. of California Davis, Bd. Of Trs.*, 225 F.3d 1115, 1126 (9th Cir. 2000)).  Here, Plaintiff alleges she was overlooked for appointment to serve as the interim or pro tem city manager in favor of less qualified, white candidates. Pl.'s Resp. 15. Failure to appoint an employee to a temporary position can be an adverse employment decision if the temporary move involves a change in conditions of employment such as an increase in pay. *Kraus v. Presidio Tr. Facilities Div./Residential Mgmt. Branch*, 704 F. Supp. 2d 859, 865 (N.D. Cal. 2010).[9]

     Both parties agree that Defendant employed several interim or pro tem city managers while looking for a permanent city manager. Def.'s Repl. 7; Pl.'s Resp. 15. Plaintiff stated in her testimony that she offered to fill the position of interim city manager on more than one occasion

---

[8] The Court notes that Plaintiff first added her claims regarding unpaid leave in her responsive brief. Arguments made in opposition to a motion for summary judgment that are outside the scope of the complaint should be construed as a motion to amend the pleadings under Fed. R. Civ. P. 15. *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014). Defendant has stated it would object to any motion Plaintiff might raise to further amend her Complaint.

[9] Neither party addresses exactly what conditions of employment changed when someone was appointed interim or pro tem city manager, but no argument was made that it was not an adverse employment decision, so the Court assumes there was some change in conditions.

but received no response. Cambreleng Decl. ¶ 33 Ex. 32 (Jackson Depo.) 144, 211. [10]  Plaintiff

alleges she communicated her interest in the interim city manager position to Defendant, both

directly and through her union. *Id*. Additionally, Plaintiff alleges that although she had

performed the responsibilities of interim city manager, the city always appointed white people

with less experience to fill the role. FAC ¶¶ 67, 70. There is also evidence in the record that both

Guenther and Sant were appointed to the role of interim city manager, despite neither having

experience as a city manager. Jackson Depo. 101-102; Cambreleng Decl. ¶ 6 Ex. 5 (Guenther

Depo.) 10, 15-16. Plaintiff has established a genuine factual issue with regard to her being

overlooked for appointment to interim city manager role. At this stage in the proceedings, this is

sufficient to survive Defendant's motion for summary judgment as to the federal claims and any

state claims within the appropriate time frame.

   *B.  Lost Compensation*

   Plaintiff next argues that she "lost several thousand dollars in compensation" under City

Manager Lambert but fails to provide any evidence to support this claim. Specifically, Plaintiff

alleges that her pay was reduced from $63,000 to $60,000 by Ms. Lambert. FAC ¶ 113. But there

is a lack of evidence in the record to support this claim. Moreover, Plaintiff fails to connect the

dots from the alleged loss in compensation to racial discrimination or establish that others

outside her class were treated more favorably.

   First, Plaintiff offers no evidence that there was a decrease in her pay except for her own

testimony which is light on specifics. Plaintiff testified that she discovered the mistake when she

looked at her W2. Jackson Depo. 207. Plaintiff explained that she is not "real thorough when it

---

[10] Portions of Ms. Jackson's deposition were included by both parties. References will be to the
deposition page number not to the individual exhibits.

comes to looking at every single pay…. I don't look at my paychecks." *Id.* And she could not

provide an amount that she believes she is owed because she did not know how far it went back

or even what the error was. *Id*. at 209.  In her Response, Plaintiff notes that her payroll records

had been requested but were not provided and neither party followed up on the oversight. Pl.'s

Resp. 15, n.3. However, as reflected in her deposition testimony, there are other ways to

demonstrate a payroll discrepancy. *See* Jackson Depo. 207-210.

Second, even if the Court were to assume Plaintiff's pay decreased, there is no evidence

to tie the decrease to Ms. Lambert. When asked about the alleged pay reduction at her

deposition, Plaintiff's reply was less than clear: "[i]t happened. Now, I don't know that

[Lambert] was solely responsible, but my pay declined. How it happened? I couldn't even tell

you." *Id.* at 207. She then goes on to explain that she spoke to various people in payroll to

determine what the error was and how to fix it. *Id*. at 208-09. They apparently made a change,

but Plaintiff still did not believe it was correct. *Id*. at 208. According to Plaintiff's account, the

people she spoke to in payroll said they would try to figure it out; no one said her pay had been

reduced by Ms. Lambert or indicated that this was anything other than a potential error. *Id.* This

is not surprising, as Plaintiff said errors had occurred in payroll in the past. *Id*. at 208-10. Yet,

when asked, Plaintiff said she believed it was racially motived and was done by Ms. Lambert. *Id.*

at 210. But there is absolutely nothing in the record that indicates any involvement by Ms.

Lambert in the pay issue or that it was related to race.

While a party's testimony may be sufficient to survive summary judgment, that testimony

must be based on personal knowledge, consistent with prior testimony and not state only

conclusions. *Enter. Mgmt. Ltd., Inc. v. Construx Software Builders, Inc*., 73 F.4th 1048, 1055

(9th Cir. 2023). While Ms. Jackson certainly has personal knowledge of her discovery that she

thought her pay was wrong and her efforts to correct it, her testimony is bereft of any facts that support her accusation that her pay was actually reduced. *Id.* (noting that the deposition and declaration "provided detailed facts" supporting the statements in those document). And she has no personal knowledge regarding whether Ms. Lambert had anything to do with it; that is just her conclusion. With no factual support for her conclusory statements that her pay was reduced by Ms. Lambert she cannot survive summary judgment. *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1194 (9th Cir. 2016) (concluding that "'conclusory, self-serving affidavit' [was] insufficient to raise a triable issue of fact, . . because it lack[ed] 'detailed facts and any supporting evidence'").

Plaintiff's claim that she was denied out-of-class pay after taking on additional work following City Manager Lambert's departure fails for similar reasons. On July 1, 2023, Plaintiff requested out-of-class pay from interim City Manager Sant for extra work she was performing. Mr. Sant told Plaintiff she would receive out-of-class pay beginning July 15, 2023. FAC ¶ 112. Plaintiff now alleges that the failure to pay her out-of-class pay for the period of July 1 through July 15 is evidence of racial discrimination.

Plaintiff provides no evidence that she was denied two weeks of out-of-class pay based on racial discrimination. In her deposition testimony, Plaintiff stated that she was instructed by Sant to "take back whatever you need to take back and do something, get this office back together." Jackson Depo. 101. According to Plaintiff, she "proceeded to do [the] work" and on July 1, 2023, she requested out-of-class pay. *Id*. at 102. When Mr. Sant informed Plaintiff she would receive out-of-class pay beginning July 15, rather than July 1, she testified that she immediately emailed asking for confirmation of the July 15 date. *Id*. After which, Plaintiff

testified that "I thought, why on earth would he do that if I was working out-of-class and it's in our contract . . . " *Id*.

But Plaintiff provides no evidence of if or when she was instructed by Mr. Sant to take on extra work or that he had any idea she was working out of class before she told him. All he said was that she could take back work that had been taken from her—one of her complaints against Ms. Lambert—and asked for assistance getting the office back together. Plaintiff took on additional duties to get the office back together and then asked for out-of-class pay. It is unclear when that request was made, but it was granted effective July 15. *Id*.

There is nothing in the record reflecting that Plaintiff was ordered to work out of class or that she was required to keep the additional duties until July 15. And nothing in Plaintiff's testimony points to racial discrimination as reason for Mr. Sant granting her request as of July 15, rather than July 1. Here again, we have only a bare assertion that Plaintiff was owed additional pay, was deprived of that pay, and that the deprivation was based on racial discrimination. "[A plaintiff's] conclusory allegations, unsupported by facts, are insufficient to survive a motion for summary judgment." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1116 (9th Cir. 2003) As Plaintiff has provided no evidence to support this claim, summary judgment must be granted as to this claim.

### C.  Unpaid Leave

In her Response to Defendant's Motion, Plaintiff for the first time alleges an adverse action based on her twice being placed on unpaid administrative leave by Ms. Lambert. These allegations are not in the FAC, but the Court will address them anyway. It appears from Plaintiff's response that the leave periods at issue are from June 15 to July 1 and July 15 to some point in August.

On December 22, 2021, Plaintiff submitted a FMLA form to the then-city manager requesting six months of leave. When Ms. Lambert became the city manager, she determined that Plaintiff was not entitled to FMLA leave informed her as such on March 31, 2022. [11]  First Lambert Decl. ¶ 6 Ex. 5. Ms. Lambert also clarified that Plaintiff was not entitled to six months of unpaid leave under the city's policy because that had not been approved. *Id.*  At that point, Plaintiff had been on leave for almost 14 weeks and was using accumulated and borrowed paid leave. When that ran out, she went on unpaid leave. *Id*. Despite Ms. Lambert saying that Plaintiff was not entitled to six months of leave—a contention Plaintiff disputes—Plaintiff was allowed to remain on unpaid leave until June 15, 2022, or almost six months.[12]

During the period following the March 31 letter, however, there were ongoing discussions regarding when Plaintiff would be able to return to work. And there was conflicting information about whether she could return and if accommodations would be needed. After some back and forth, Ms. Lambert notified Plaintiff on June 22, 2022, that the paperwork was adequate to return to work on July 1, 2022. Second Lambert Decl. ¶ 12 Ex. 14. Ms. Lambert's letter stated she would be placed on paid administrative leave from June 15, 2022 through July 1, 2022. *Id*. Plaintiff refers to this period as being unpaid leave, but there is no evidence to support

---

[11] FMLA allows covered employees to take twelve weeks of unpaid leave and have their job protected. 29 U.S.C. § 2612. But employees may use accrued leave. *Id.*; 29 C.F.R. § 825.207. The FMLA applies to employers with more than 50 employees and all public employers, but an employee is not eligible for FMLA if they work at a location with fewer than 50 people if the total number of employees with 75 miles is less than 50. 29 U.S.C. § 2611.

[12] Plaintiff cites the deposition of Ms. Guenther to show that Ms. Guenther granted her the leave, but that it was simply the wrong type. What Ms. Guenther said what that Plaintiff "told" her she was taking FMLA leave, and that Ms. Guenther believed she was entitled to it. Cambreleng Decl. ¶ 6 Ex. 5 (Guenther Depo.) 33.

that.[13] It is unclear how being placed on paid administrative leave can be considered an adverse

action, but even if it could, Plaintiff offers no evidence of racial discrimination.

Plaintiff was placed on unpaid administrative leave on July 15. This leave was the result

of Plaintiff providing a signed form dated July 13, 2022, that said she was permanently unable to

perform her job functions. Second Lambert Decl. ¶ 16 Ex. 15. Plaintiff provided an updated note

on July 15, but did not address the requested information about her upcoming doctor visits.

Second Lambert Decl. ¶ 19. Once all the documents were provided, Plaintiff returned to work

and the City ultimately paid her for the time she was on leave. *Id*. Again, no evidence of racial

discrimination is offered other than general, unsupported claims that this did not happen to other

employees.

Neither period of administrative leave is an adverse action. In the first instance, Plaintiff

was paid. The second period of unpaid leave was converted to paid leave after Plaintiff provided

medical documentation that she was fit to work. Thus, neither period could be said to have

"materially affected the compensation, terms, conditions, or privileges of . . . employment.'"

*Davis*, 520 F.3d at 1089 (quoting *Chuang*, 225 F.3d at 1126). Nor can Plaintiff point to any

evidence of employees outside her class being treated more favorably. *Davis*, 45 F. Supp. 3d at

1251.

---

[13] Plaintiff cited to three exhibits in her brief regarding this issue, but none says that her leave from June 15 through July 1 was unpaid. *See* Pl.'s Resp. 5 (citing Cambreleng Decl. ¶ 18 Ex. 17 at p. 3); *id.* at 16 (citing Cambreleng Decl. ¶¶ 34, 35 Exs. 33, 34). In fact, the only exhibit that actually mentions that period, Exhibit 17, specifically says the leave during that period was paid. Cambreleng Decl. ¶ 18 Ex. 17 at p. 3. Exhibit 33 pertains to an agreement to convert Plaintiff's unpaid leave from July 15 to August 2, into paid leave. It makes no mention of the earlier period. *Id.* ¶ 34 Ex. 33. Exhibit 34 is a letter to Plaintiff from City Manager Lambert implementing a confidential, non-disciplinary work plan. *Id.* ¶ 35 Ex. 34.

But even if she could, Defendant has put forth a nondiscriminatory reason for the leave, namely, the conflicting doctors' notes about her ability to return to work. To the extent that Plaintiff claims this is pretext because no one else was treated the same way, she fails to provide any indirect or direct evidence that it is more likely than not that Defendant's actions were motivated by a discriminatory purpose. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001). She has not shown a general practice or procedure with respect to minority employment or that other white employees were treated different save for her own testimony. *Davis*, 45 F. Supp. 3d at 1252. That is not sufficient. Plaintiff's claims based on her being place on unpaid administrative leave must be dismissed.

In summary, Plaintiff has pled sufficient facts to state a prima facie case for racial discrimination based on being overlooked for appointment to the role of interim city manager. Summary judgment is granted as to all other claims and allegations of discrimination based on race.

## V.     Retaliation Claims

Plaintiff alleges that Defendant engaged in acts of retaliation against her for "opposing unlawful and discriminatory acts." FAC ¶¶ 135-142. And she brings her claims under both Title VII (42 U.S.C. § 2000e-3(a)) and Oregon law (ORS 659A.030(1)(f)).

Because Oregon's retaliation statute is modeled after Title VII, these claims are analyzed together.[14] At their core, these statutes protect employees from discrimination because they opposed an unlawful employment practice. *Lindsey v. Clatskanie People's Util. Dist*., 140 F. Supp. 3d 1077, 1086 (D. Or. 2015). To sustain a prima facie claim for retaliation, a plaintiff must

---

[14] While they are analyzed together, in this case, the time period for the state claims is limited to those claims that occurred within 180 days of the TCN and the filing of the lawsuit.

show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action. *Id.*

In the context of Title VII retaliation claims, "[a]n action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000). As to the requisite causal link, "[c]ausation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

Plaintiff alleges she was subjected to retaliatory acts by City Manager Lambert, including "stripping her of job duties and responsibilities, denying previously approved and provided accommodations for her disability, and attempted discipline." FAC ¶ 75. And that these actions occurred shortly after she filed her BOLI complaint which is a protected activity. The remaining questions are whether she suffered an adverse employment action and whether there is a causal link between the adverse action and the protected activity.

### A.  Job Responsibilities

Plaintiff alleges City Manager Lambert removed "all but two job responsibilities" in retaliation for filing her BOLI complaint and her TCN. FAC ¶ 79; Pl.'s Resp. 21. Stripping an employee of job responsibilities can be considered an adverse employment action. *See Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000).

Plaintiff also alleges facts sufficient to establish a causal link between the removal of Plaintiff's job responsibilities and her protected activities. Plaintiff filed her TCN in January

2022 (before Ms. Lambert was hired) and her BOLI and OWCA complaints in March 2022. Pl.'s Resp. 21; First Lambert Decl. ¶ 4 Ex. 4. At that time, she was on leave. Two weeks after Plaintiff filed her BOLI complaint and the day after she filed her OWCA complaint, Ms. Lambert notified Plaintiff she was not entitled to FMLA leave and the process began to have her return to work. First Lambert Decl. ¶ 6 Ex. 6. When she finally returned on July 5, 2022—less than four months after she filed her BOLI and OWCA complaints—she learned her job duties had been reassigned while she was on leave. FAC ¶ 79. None of the job duties were returned to her when she resumed work. Pl.'s Resp. 21-22. While timing is not always sufficient to establish causation, the timing of these actions establishes a link. *See Lindsey*, 140 F. Supp. 3d at 1088; *cf. Yartzoff*, 809 F.2d at 1376 (lapse of three months between filing of administrative complaint and adverse action sufficient to establish causation). While on leave, she filed claims against the City and immediately upon her return, she was prevented from resuming her prior duties. This creates an inference of retaliation.

      *B. Denying Previously Approved Accommodation*

      Plaintiff also claims that changes to her workspace amount to an adverse employment action based on both retaliation and disability discrimination. Plaintiff alleges that she was forced to work at a desk that was not set up to accommodate her back problems. FAC ¶ 83. Records show, however, that Plaintiff requested and was granted the requested accommodations. First Lambert Decl. ¶¶ 8-9. Plaintiff takes issue with having to provide a doctor's note that the accommodation of a printer was necessary but fails to provide any authority as to why such a request would be unreasonable. The fact that Plaintiff requested and was granted reasonable accommodations forecloses her contention that she suffered an adverse employment action based on workstation changes.

C. *Attempted Discipline*

In her FAC, Plaintiff argues she was subjected to retaliatory discipline based on her taking protected medical leave. FAC ¶ 155. However, Plaintiff has since dropped her FMLA related claims. Pl.'s Resp. 30. Plaintiff instead argues in her response for the first time that she was subject to increased scrutiny and placed on a performance improvement plan within seven weeks of her return to work and that amounts to retaliation. Pl.'s Resp. 24; *see also* Cambreleng Decl. ¶ 8 Ex. 7 (Lambert Depo.) at 97-98 (noting the performance improvement plan was in October). But Plaintiff offers nothing to show that the performance improvement plan was a disciplinary action.[15] *See* Lambert Depo. 97-98. A non-disciplinary work plan that did not materially change her terms of employment is not an adverse action. *James v. C-Tran*, 130 F. App'x 156, 157 (9th Cir. 2005) ("Because the performance improvement plan was non-disciplinary training that did not materially impact James's compensation, terms, conditions, or privileges of employment, it was not an adverse employment action.")

Regardless, Plaintiff offers no evidence that the performance improvement plan—which came after her return to work and seven months after the filing of her complaints—was initiated in retaliation. *See T.W. Elec. Serv.*, *Inc.*, 809 F.2d at 630 (the non-moving party must present "specific facts showing that there is a genuine issue for trial") (quoting Fed. R. Civ. P. 56(e)). While Plaintiff points to the limited amount of time she had returned to work when the plan was implemented, it is too attenuated from the filing of her complaints. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002).

---

[15] Plaintiff included the work plan in the exhibits to her declaration. It specifically says it is a "confidential, non-disciplinary Work Plan." Cambreleng Decl. ¶ 35 Ex. 34.

In summary, Plaintiff has plausibly alleged a claim for retaliation based on her job responsibilities being removed; summary judgment is denied on that claim. Defendant's motion for summary judgment is granted, however, as to Plaintiff's claims for retaliation based on her workspace being changed and attempted discipline.

## VI.    Disability Discrimination Claims

Finally, Plaintiff alleges discrimination based on a disability under ORS 659A.112. The Oregon statute, like the federal Americans with Disabilities Act (ADA), prohibits discrimination based on a disability. To establish a prima facie case of discrimination, Plaintiff must show that she: "(1) is [] disabled or perceived as such; (2) is a qualified individual, meaning [s]he is capable of performing the essential functions of the job; and (3) suffered an adverse employment action because of [her] disability." *Shepard*, 829 F. Supp. 2d at 963. Separately, the Oregon statute also establishes that an employer who fails to provide a reasonable accommodation or fails to engage in a meaningful interactive process discriminates against an employee. *Id.* (citations omitted).

In her Response, Plaintiff points to both her PTSD[16] and her back issues as evidence of a disability. Pl.'s Resp. 27. In terms of the alleged discrimination, Plaintiff points to her change in job duties, lack of flex time, change in her workspace, and increased scrutiny as evidence that she suffered an adverse employment action. Pl.'s Resp. 27-28.

### A.    Alleged Adverse Employment Actions

Although not clearly stated, Plaintiff seems to allege that she was discriminated against because she had PTSD when her job duties were changed and she was denied flex time. Pl.'s Resp. 28-29. Plaintiff has failed, however, to establish any connection between her job duties

---

[16] There is no reference to PTSD as a disability in the complaint.

being reassigned and her alleged disability.[17] For example, regarding her job duties, Plaintiff

states only that following her return to work, "she found that job duties were taken away." Pl.'s

Resp. 28. Plaintiff makes no mention of either her PTSD (or her back pain) as being the cause of

her job duties being removed. *Id.*

With regards to her requests for flex time, Plaintiff first contends that other employees

were allowed to flex their schedules, but she was not. Pl.'s Resp. 28. But the only evidence she

offers that she was treated differently are her own statements that she was forced to use unpaid

leave when others were not.[18] *See* Jackson Decl. ¶ 8, ECF No. 51. That is not sufficient. *See*

*Enter. Mgmt. Ltd., Inc.*, 73 F.4th at 1055; *see also Consumer Fin. Prot. Bureau v. Gordon*, 819

F.3d 1179, 1194 (9th Cir. 2016) (finding a plaintiff's declaration failed to "raise a triable issue of

fact" because it lacked "detailed facts and any supporting evidence") (quoting *FTC v. Publ'g*

*Clearing House Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)). And again, Plaintiff fails to make the

connection between being denied flex time and any disability.

Plaintiff also alleges she suffered additional adverse actions including being subjected to

increased scrutiny and being placed on a performance improvement plan (PIP). First, for either

the increased scrutiny or the PIP to be considered an adverse action, Plaintiff would need to

show that they materially affected her "'compensation, terms, conditions, or privileges' of

employment." *James*, 130 F. App'x at 157 (quoting *Little v. Windermere Relocation, Inc.*, 301 F.

3d 958, 970 (9th Cir. 2002). Here Plaintiff has made no such showing. Nor could she because

---

[17] As discussed above, the Court agrees that the change in job duties could amount to retaliation.

[18] In addition to her own declaration, Plaintiff cites to an email it appears she sent to a non-party detailing her complaints. In that email she complains that she is being forced to take leave while other employees get to adjust their schedules. Cambreleng Decl. ¶ 20 Ex. 19. This is simply her own statement; the fact that she summarized her complaints in an email for a third party is irrelevant and inadmissible.

without more, actions such as written warnings and performance improvement plans are not

adverse actions. *Id.*; *see also Cozzi v. Cnty. of Marin*, 787 F. Supp. 2d 1047, 1061 (N.D. Cal.

2011) (warnings and performance improvement plans are not adverse actions where they do not

materially affect the terms and conditions of employment). The PIP was non-disciplinary in

nature and did not materially impact Plaintiff's compensation, terms, conditions, or privileges of

employment. *James*, 130 F. App'x at 157. And her vague references to increased scrutiny are not

sufficient to establish discrimination.

Additionally, Plaintiff barely attempts to connect the alleged adverse actions to her claim

of disability discrimination. Pl.'s Resp. 29.  Instead, Plaintiff merely states that "the temporal

proximity" between her return from leave and her request for accommodations and the

implementation of the performance improvement plan is sufficient to demonstrate causation.

Pl.'s Resp. 29. It is not. This is not a retaliation claim; Plaintiff is alleging discrimination based

on her disability. And Defendant was aware of the disability for months before Plaintiff was

placed on the work plan. She simply has not tied the work plan to her disability in any way or

otherwise tied it to circumstantial evidence that supports the conclusion it was a result of her

disability. *Cf. Ariston v. U.S. Postal Serv.*, No. 3:21-CV-01669-HL, 2023 WL 6004200, at *5 (D.

Or. Aug. 1, 2023), *report and recommendation adopted sub nom. Ariston v. United States Postal

Serv.*, No. 3:21-CV-01669-HL, 2023 WL 6296651 (D. Or. Sept. 26, 2023). There is simply not

an inference of discrimination here.

### B.  *Reasonable Accommodation*

Plaintiff also alleges that Defendant failed to engage in the interactive process and denied

her reasonable accommodation request for her disability. In her Response, she refers to two

different requests: (1) a request for flex time and (2) a request for a workspace modification. Pl.'s

Resp. 29-30. With respect to the flex time, it appears this request is related to her PTSD not her back and the need to attend medical appointments. Plaintiff contends there is no evidence that Ms. Lambert engaged in the interactive process regarding the request for flex time. *Id.* That may be true, but there is also a lack of evidence—both in her Complaint and the evidence submitted for this motion—about the request itself including how and when it was made.

The citations provided by Plaintiff in her Response brief do not clarify this issue. In her declaration, Ms. Jackson complained about having to show a note for attending doctor's appointments when other employees did not, but she does not mention a denial of flex leave. Jackson Decl. ¶ 8. What is left is an email from July 2022 sent by Plaintiff to a non-party in which she complains that she has to use her sick and vacation time when other employees are allowed to adjust their schedules. Cambreleng Decl. ¶ 20 Ex. 19. At most, this is an example of what Plaintiff would testify to at trial, but it provides no facts to support her contention that she was being denied requested flex time that others were receiving.

Plaintiff also ignores that this occurred at the same time the City was requesting documentation related to the medical appointments and received conflicting information about her ability to work at all. Second Lambert Decl. ¶¶ 15-16. Plaintiff ultimately did submit additional documentation and returned to work, but nothing in the record suggests that she made any sort of request for flex time upon her return. This is problematic for Plaintiff because activities in July 2022 are barred under the OTCA. Absent any facts to support her contention that a request was made and ignored, particularly in the applicable time frame, summary judgment is appropriate. *See Randle v. Tri-Cnty. Metro. Transportation Dist. of Oregon*, 171 F. Supp. 3d 1084, 1089 (D. Or. 2016) (granting summary judgment where the plaintiff relied on only conclusory statements that the defendants failed to engage in the interactive process).

The second claim related to lack of a reasonable accommodation also fails. In her complaint, she alleges that she was denied accommodations that were necessary due to left-handedness and back pain from past surgeries. FAC at ¶ 80.

Defendant first argues that Plaintiff has failed to prove she has a qualifying disability as to this claim. An individual has a qualifying disability when it is a "physical or mental impairment that substantially limits one or more major life activities" or a "record of having a physical or mental impairment that substantially limits one or more major life activities of the individual." ORS 659A.104(a)-(b). Plaintiff has offered no evidence that her back pain limits any major life activities. And, from the record, it is clear that Defendant was not aware of any physical limitations regarding Plaintiff's back pain. *See* First Lambert Decl. ¶ 8; Beaucaire Decl. ¶ 4; Guenther Decl. ¶ 4. Plaintiff's FMLA paperwork cited only PTSD related concerns and made no mention of back pain. Guenther Decl. ¶ 3 Ex. 6. Nor has Plaintiff identified any specific limitations caused by her alleged impairments. Plaintiff has worked for the city for over twelve years; it stands to reason that if she were receiving disability accommodations, documentation of a disabling condition would have come into play at some point. Plaintiff has failed to show she has been under a qualifying disability.

Additionally, even if Plaintiff could establish a qualifying disability, her claim of discrimination still fails at the third step of the test. Defendant provided Plaintiff with her requested accommodations, including a left-handed mouse and keyboard, a sit to stand desk configured for a left-handed individual, and a tall sitting drafting chair. First Lambert Decl. ¶¶ 8-9. Plaintiff requested, and was granted, her own printer although Lambert did request Plaintiff provide a note attesting to the necessity of a printer. *Id*. Even so, an employer requiring medical documentation when considering a disability accommodation is not a sign of disability

discrimination. *See, e.g., Allen v. Pac. Bell*, 348 F.3d 1113, 1115 (9th Cir. 2003). Thus, no request was denied.

Because she has not shown she has a qualifying disability and that she was refused a reasonable accommodation, Plaintiff has failed to state a prima facie case for disability discrimination.

## <u>CONCLUSION</u>

For these reasons, Defendant's motion is DENIED as to the following claims:

(1) Plaintiff's claims for race discrimination based on being overlooked for appointment to interim city manager role;

(2) Plaintiff's claims for retaliation based on job duties being removed.

Defendant's motion is GRANTED as to all other claims alleged in Plaintiff's FAC and Response.

IT IS SO ORDERED.


DATED this  9th  day of December, 2025.

 /s/Amy E. Potter
AMY E. POTTER
United States Magistrate Judge

PAGE 38 – OPINION & ORDER